OPINION OF THE COURT
Edward J. Greenfield, J.
The issue to be determined in this case is the extent to which the chancellor of the City University of New York has the discretion to disapprove recommendations for tenure previously made by faculty committees on the basis of approved criteria when the law vests the power to grant tenure pursuant to such criteria exclusively with the Board of Trustees of the City University. This court does not seek to interject itself in basic judgments of academic competence, but must scrutinize the exercise of such judgments by those in academia to ascertain if decisions about law professors were made in accordance with law.
Plaintiffs, a group of law professors, who denominate themselves as the faculty of the City University of New York Law School at Queens College have, in this action for declaratory and injunctive relief, moved for a preliminary injunction to compel defendant Joseph S. Murphy, Chancellor of the City University of New York, to make an interim reappointment of two of the law school professors as associate professors without tenure for the 1988-1989 academic year pending a reevaluation of their applications for tenure.
The City University of New York (CUNY) is a public university administered pursuant to Education Law, article 125, §§ 6201-6233. It is composed of community colleges and senior colleges in all boroughs of New York City, as well as a graduate division. The legislative intent in providing State support for the system is explicated in section 6201:
"3. The legislature’s intent is that the city university be supported as an independent and integrated system of higher education on the assumption that the university will continue to maintain and expand its commitment to academic excel *527 lence and to the provision of equal access and opportunity for students, faculty and staff from all ethnic and racial groups and from both sexes.
"4. The city university is of vital importance as a vehicle for the upward mobility of the disadvantaged in the city of New York * * *
"5. Only the strongest commitment to the special needs of an urban constituency justifies the legislature’s support of an independent and unique structure for the university. Activities at the city university campuses must be undertaken in a spirit which recognizes and responds to the imperative need for affirmative action and the positive desire to have city university personnel reflect the diverse communities which comprise the people of the city and state of New York. In its urban environment this commitment should be evident in all the guidelines established by the board of trustees for the university’s operation, from admissions and hiring to contracting for the provision of goods, services, new construction and facilities rehabilitation.”
The City University Law School was established at Queens College in 1983 as a constituent element of the university system with the proclaimed mission of training potential members of the Bar for practice in the public interest, to "serve the underserved”, and through teaching methods blending practical and analytic training, to devise a new clinical methodology for acquainting members of groups presently unrepresented in the legal profession with the lawyering process. Its proud motto is "Law in the Service of Human Needs.” Its emphasis on practical confrontation and the clinical dealing with "real world” problems in a holistic approach to the law would leave the devotees and disciples of the appellate case analysis pioneered by Christopher Columbus Langdell aghast, and sadly shaking their heads. While the new law school has stirred accolades and enthusiasm in some quarters of the world of legal education, it has also aroused a considerable degree of skeptical eyebrow raising. The school attempts to carry out its "mission” with great zeal and fervor and with a law school faculty and student body composed largely of women and minorities. According to some, it has had a major impact on reshaping the thinking about legal education in our times; to others, it has demonstrated marked ineptitude, as illustrated by the fact that only a disproportionately small percentage of its initial graduating classes were about to pass the New York State Bar examination.
*528 This lawsuit turns on the rejection by the chancellor of two members of the original founding faculty who, after teaching for five years, would have acquired tenure if reappointed. Pursuant to Education Law § 6212 (3), if a faculty member has served in a teaching position for five successive years and is reappointed for a sixth year, that faculty member is accorded tenure and remains as a permanent member of the teaching staff and cannot be removed except for good cause shown, and with built-in procedural safeguards. (Education Law § 6212 [1] [c].) Until that time, a nontenured teacher, like other probationary government employees, may be discharged or denied reappointment without any reason being given. (Pauk v Board of Trustees of City Univ., 119 Misc 2d 663, mod on other grounds 111 AD2d 17, affd 68 NY2d 702.)
The CUNY Law School having been in operation for five years, there were seven members of the original faculty whose reappointment for the 1988-1989 academic year would have given them the much coveted tenure. One of the faculty members withdrew his name from consideration, but the six others (including two librarians) were initially evaluated and approved unanimously by the law school committees concerned and then by a Joint Law School-Queens College Review Committee. After unanimous approval by them of all six candidates, the president of Queens College then transmitted the recommendations to the chancellor of the City University.
The review committee, in its approval of tenured status, expressed some uncertainty as to the appropriate standards to be applied for reappointment. The chancellor and the president, instead of transmitting the recommendations of the three committees and the dean to the Board of Trustees, jointly notified all the candidates that the procedures adopted in approving their appointment were procedurally lacking in that there was inadequate documentation of their teaching effectiveness, and particularly that the review committee had not made appropriately searching inquiry into the qualifications called for by the law school governance plan. Consideration of the candidates was remanded in all cases to the review committee to consider further "evidence of both faculty and student evaluation of your teaching effectiveness.”
After the nominations had been sent back for reconsideration, the review committee, which was composed of three members of the law school faculty and three faculty members from Queens College, appears to have disagreed on the criteria to be applied. Nevertheless, four of the candidates were unani *529 mously approved. The vote for approval of Professor Merton was 4 to 1 with one abstention. The vote for approval for Professor La Rue was 3 to 2 with one abstention. Each of the negative votes and abstentions were by members of the college faculty, while the law school faculty voted unanimously for all candidates. The recommendations were once again sent on to the president of Queens College and the chancellor. The chancellor and the president then wrote to Professor La Rue and Professor Merton, who had not achieved unanimous votes on the second go-round, advising them that they would not be recommended for reappointment and that their teaching contracts would not be renewed. The chancellor declined to pass their cases on to the Board of Trustees of the City University for consideration.
There were widespread protests from the faculty, from the student body and from teachers at other law schools about the rejection of Professors La Rue and Merton. This action was then commenced against the chancellor, not only by Professors La Rue and Merton themselves, but by 31 other members of the law school faculty. The complaint asks for a declaratory judgment that it is the tenure criteria of the law school which are those applicable to appointments of the law school faculty, that Professors La Rue and Merton have satisfied all lawful prerequisites for tenure and, further, that the denial of tenure to Professor La Rue, who is black, and Professor Merton, who is female, while tenure was granted to three white males, is a violation of title VII of the Civil Rights Act of 1964 and of section 296 of the New York Executive Law, giving rise to a cause of action under 42 USC § 1983. The complaint further asks for a permanent injunction to compel Chancellor Murphy to comply with the established governance and tenure review system and to transmit to the City University Board of Trustees the recommendation that Professors La Rue and Merton be reappointed with tenure or a statement of reasons for a refusal to so recommend.
On this motion, plaintiffs’ request is for interlocutory relief for reappointment of those two members of the faculty as associate professors without tenure for the 1988-1989 academic year, until final resolution of the entire matter.
STANDING TO SUE
This action is brought in the names of all, or almost all, of the law school faculty of the CUNY Law School, including *530 Professors Merton and La Rue. They contend that the maintenance of the independence and integrity of the CUNY Law School and the achievement of its mission turns on the reappointment of the two professors denied tenure. They claim that they will all suffer irreparable injury if Professors La Rue and Merton are not reappointed, since failure to do so will effect their plans for teaching, research and community activities in the next year; that they are thrown into uncertainty as to requirements of their own forthcoming applications for tenure if the criteria are changed; that the change of criteria will undermine the unique pedagogy which distinguishes CUNY Law School from more traditional schools; and will require the closing of some of the school’s clinics for legally indigent clientele; and damage the reputation of the school as a pathfinding institution. Indeed, they contend, the denial of tenure sends a negative message to women, to minorities and to those seeking to emulate the pioneering efforts of the rejected professors.
The defendant opposes the motion for a preliminary injunction, and has made a cross motion to dismiss the complaint. The defendant challenges the standing of the plaintiffs to sue, insists that neither the court nor the chancellor has the power to reappoint Professors La Rue and Merton for a year pending resolution without tenure, and that no viable cause of action is set forth in the complaint.
The concern and outrage evidenced by faculty over the nonappointment of their colleagues is understandable and their loyalty laudable. While the decision complained of may also cast a pall on their own futures and instill personal feelings of insecurity, and while there may, indeed, be extra teaching burdens that some may have to bear if the teaching staff is left shorthanded, it is evident that the interest of all other faculty members, apart from Professors Merton and La Rue, is indirect and tangential at best. Concern about how someone else is dealt with, no matter how keenly felt, is not tantamount to a legal interest in a lawsuit about the process. The personal and property rights of the remainder of the faculty are not specifically or presently affected. (Abrams v New York City Tr. Auth., 48 AD2d 69, affd 39 NY2d 990.) Undeniably, judicial intervention may be had to review discretionary administrative decision making, but the proceedings for such review may be initiated only by the persons directly affected.
Defendant cites the results in a similar action brought in *531 the United States District Court for the Eastern District of New York, where members of a university faculty protesting a denial of tenure to a colleague were found to lack standing to sue. (Dube v State Univ. of N. Y., CV 87-1599.)
On the question of standing, this court is inclined to agree. The only parties who will be recognized as having standing to sue herein with respect to the denial of reappointment and tenure are the two persons directly affected, Professor Homer La Rue and Professor Vanessa Merton.
THE TENURE PROCESS
The tenure process for the law school faculty is governed by the bylaws of the CUNY Law School adopted by the University Board of Trustees on June 27, 1983 and the CUNY Law School internal governance plan approved by the Board of Trustees on March 25, 1985. Under bylaws § 1-1, the law school is set up as a unit of the City University affiliated with Queens College. That section further provides: "Within general policies established by the Board, the Dean and Faculty of the Law School, shall have the responsibility for formulating and administering the program of the school, including such matters as Faculty selection, retention, promotion and tenure”.
As the law school was a new and as yet untested institution, provision was made in the bylaws for overseeing the school by the established administration of Queens College. Hence, section II-l of the bylaws provided for all faculty appointments to be recommended to the chancellor both by the dean of the law school and by the president of Queens College. While the law school faculty was to exercise substantial control over faculty appointments, promotion, and tenure (§ II-3), the president of Queens College was called upon to review the law school’s recommendations on nontenured positions "for procedural regularity” and submit them, along with her own recommendation, to the chancellor. (§ II-4.) For tenured positions, favorable recommendations by the law school were to be referred to a joint review committee composed equally of law school and college faculty members. (§ II-5.) The review committee’s findings are passed on to the president of the college, who is required to submit the committee’s recommendations along with her own and the report of the dean of the law school to the chancellor for his review and submission to the Board of Trustees.
*532 Full-time teaching and library faculty above the rank of instructor who have completed five consecutive years of service and are reappointed to a sixth year are given tenure, and become members of the "permanent instructional staff.” (Education Law § 6212 [1] [c].)
When a member of the faculty is to be considered for tenure, governance plan § VI-D (2) calls for consideration by the "Tenure Review Committee” which has the primary responsibility for evaluating teachers for tenure. That committee’s recommendation must then be presented to the law school personnel and budget committee which in turn forwards its recommendation to the dean. The dean then is to forward the recommendation to the president and the chancellor in accordance with bylaws, article 2, § 5.
In short, there are seven forums provided for debate about the potential candidates and seven hurdles the candidates must negotiate before tenure is approved:
(1) Law school tenure review committee;
(2) Law school personnel and budget committee;
(3) Dean of the law school;
(4) Joint Law School-Queens College Review Committee;
(5) President of Queens College;
(6) Chancellor of CUNY;
(7) Board of Trustees of the university.
In this case the aggrieved faculty members got up to hurdle 6 in the chain of tenure approval, were sent back to step 4, and were finally blocked before the seventh hurdle by the chancellor.
STANDARDS FOR TENURE
The Board of Trustees of the City University is empowered to establish faculty positions for the university, and to appoint and fix salaries of its instructional personnel. (Education Law § 6206 [7].) It is clear, and both sides agree, that the power to grant tenure is vested exclusively with the Board. (Legislative Conference of City Univ. v Board of Higher Educ., 38 AD2d 478, affd 31 NY2d 926.) The duty to make the ultimate decision on appointments, promotion and tenure is nondelegable. In Cohoes City School Dist. v Cohoes Teachers Assn. (40 NY2d 774, 777-778), the Court of Appeals declared:
"In our view, the authority and responsibility vested in a *533 school board under the several provisions of the Education Law to make tenure decisions cannot be relinquished * * *
"This responsibility, with th,e accompanying grant of enabling authority, to select and screen the teaching personnel in the school must be exercised by the board * * * and cannot be delegated or abnegated.”
A question is raised here as to whether there were applied standards for tenure which were a departure from adopted standards applicable to the law school faculty. The CUNY Board of Trustees had adopted an internal governance plan for the law school which set forth tenure standards unlike those of its colleges or of other law schools. The standards for appointment seek to avoid conformity to a particular mold or pattern. Section VI-A (1) dealing with initial appointment stresses that:
"[T]the standards for faculty appointment * * * are qualitative rather than quantitative * * * they cannot be expressed a priori in terms of particular levels of experience in practicing or teaching, or of academic performance as a student or teacher. The faculty as a whole need to be diverse in the relevant strengths that its members bring as a result of their experience and interests, as well as in their personal backgrounds and approaches toward legal and societal problems.
"The standards for tenure include excellence in scholarship, teaching and service, as described in Subsection 'D’ below * * *
"It is recognized that the primary mission of the Law School is the education of men and women to be lawyers who will practice with a concern for the social responsibility of the legal profession and for the public interest, and that the School aims to teach in ways that help students to learn from their own experience and from their ability to reflect on that experience”.
The standards dealing with academic tenure are set forth in section VI-D of the governance plan, which reemphasizes the basic postulate that the teachers were to help students learn from their own experience. It was declared that this "requires the commitment of a very substantial priority to the teaching side of a faculty member’s work, and qualities of pedagogy that are empowering of the student; requires that teachers be creative and open to reasonable innovation and risk-taking.”
Because of the experimental nature of the process, the plan recognizes that "the qualities sought require a willingness to *534 learn from one’s own mistakes — which regards the making of mistakes and the failure immediately to reach one’s full goals, as compatible with excellence.’’
With respect to scholarship, section VI-D (1) (b) limits tenured appointment to persons with a demonstrated record of scholarship. They are required to be not only excellent teachers, but "willing and able to articulate their thoughts about significant problems of law, legal education and the work of lawyers in a way that is disciplined and fully developed”, and "willing to expose their thinking to the critical judgment of their peers, in teaching, in practice, in the Legislature and in the Judiciary.”
Very importantly, the standards of tenure explicitly provide that: "The criterion of scholarship does not include any quantitative measure of scholarship output.” It was recognized that "because of the school’s commitment to a new kind of teaching and learning, much of the scholarship output of the faculty during the developmental period will .necessarily involve the development of courses and course material.”
In addition to teaching excellence and scholarship, another criterion for tenure was service — service to the law school or the university, service in law reform and the representation of the underrepresented. The tenure review committee was again charged with considering a candidate in terms of commitment and priority.
Since judgment as to teaching excellence and scholarship are highly subjective in nature, the governance plan provided the means through which such judgments would be expressed. It states: "The informed professional judgment of the ad hoc Tenure Review Committee * * * and the Law School Personnel and Budget Committee is the basis for deciding whether a candidate for tenure has done the necessary scholarly work.” Section VI-D (2) fixes primary responsibility for evaluating teachers for tenure on the tenure review committee as informed by the views of relevant members of the professional and academic community. It is noted that giving primary responsibility to the law school itself on tenure decisions is in accord with the Standards and Rules of Procedure of the American Bar Association for Law Schools, and must be followed for accreditation.
EVALUATION OF PLAINTIFFS’ TENURE APPLICATIONS
The tenure review committee, in accordance with these *535 mandates, was the first to review the candidacies of Professors La Rue and Merton. The court, while not interposing itself on the question of the adequacy of their qualifications, cannot help but observe that the curriculum vitae and dossiers presented to the reviewing authorities and contained in the motion are most impressive.
Professor La Rue was a teacher of civil procedure, administrative law and labor law. The tenure review committee found he was a dedicated and caring teacher and a role model. He drafted course materials, wrote about the law and made law as an arbitrator and Hearing Officer. He attempted to deal with racism, and taught that being judged by the color of one’s skin is a reality, but not the whole reality. They commended his ability to be concerned without being self-righteous. It was noted that he was held in the highest regard by both his students and colleagues. His scholarship was not reflected in publication, but in materials he prepared for groundbreaking courses and in opinions in labor disputes, although there were several articles that he wrote dealing with arbitration. His activity with legal service organizations and as Secretary of the Labor and Employment Law Section of the State Bar Association were noted. The committee concluded that he had fulfilled the tenure standards and exemplified their spirit.
As to Professor Vanessa Merton, the tenure review committee concluded that she was a model of the qualities that the school’s tenure standards were meant to capture. She taught courses in lawyering in the public interest, civil practice, and health in the workplace. Her teaching was evaluated as having a profound impact on her students’ lives, and in emphasizing learning by doing. She was found to be a demanding supervisor, but available to share her understanding with students and to give attention to their efforts and work products. She was especially praised for her unique health in the workplace clinic. There was some reservation that she may have been too intense or too demanding. Insofar as scholarship was concerned, she was found to have written regularly on professionalism and professional responsibilities; and on questions of medical ethics. She also helped produce bilingual video tape documentaries on workers’ compensation, and on health risks in the workplace. She was found to be active in an extraordinary range of outside organizations dealing with legal and medical ethics, and served on AIDS-related committees and was a member of the Board of Direc *536 tors of the New York Women’s Bar Association and the Center for Law and Human Values, among others. She served actively on the law school’s most important committees. The tenure committee strongly recommended her for a tenured position.
The conclusions of the tenure review committee were made after extensive interviews with faculty, students, administrators and staff, and after sounding out members of the national legal and educational community.
The law school personnel and budget committee, next to review the candidates, concurred with the recommendation of the tenure review committee, after due deliberation. Thereupon, the dean of the law school sent all the recommendations on to the joint review committee, together with evaluations from faculty members and legal scholars at other law schools. The joint review committee met over the course of two weeks and voted unanimously to recommend all six candidates for tenure.
According to the affidavit of Professor John Farago, one of the founders of the CUNY Law School, and the first tenured member of the faculty, who had helped draft the law school’s tenure standards and who served on the tenure review committee and on the joint review committee, the discussions of the joint review committee centered on the ways in which the law school’s standards for tenure differed from those of the college. It was concluded that Professor La Rue and Professor Merton had nontraditional dossiers which would probably not fulfill the tenure standards of the college, but the committee concluded that they had amply met the requirements of the law school tenure standards, and voted their unanimous approval.
The acting Provost of Queens College, who served on the joint review committee, in transmitting the recommendations of the review committee to the president of the college, wrote that while all six candidates would not have met tenure standards under general CUNY guidelines, the college representatives on the joint review committee were persuaded that the candidates had met the criteria set forth by the law school bylaws. Under those circumstances, he expressed his discomfort at being involved in the process of review for law school faculty, and having to use one set of guidelines for college faculty and another set of guidelines for law school faculty. He also expressed some reservations as to the lack of system *537 atic peer evaluation and periodic class evaluation by students at the law school.
It was in the light of these unanimous recommendations of the individuals, with the expressed reservations as to the standards and procedures which led ultimately to the response of President Shirley Kenny of Queens College and University Chancellor Joseph S. Murphy. In a joint letter they declared that there had not been adequate consideration of documented peer observation of teaching or a systematic student evaluation. In passing on prior law school tenure applications, no question had ever been raised by President Kenny or Chancellor Murphy about evidence of faculty and student evaluation. They concluded that the review committees had not made an appropriate searching inquiry, as called for by the law school governance plan, and had dealt with "only sparse and anecdotal information.” All candidates were remanded to the joint review committee for reconsideration which would include faculty and student evaluations of teaching effectiveness.
Thereupon, Distinguished Professor of Law Howard Lesnick submitted a memorandum to the joint review committee outlining the materials which had been considered with respect to teaching effectiveness as well as the underlying data of student evaluation of teaching by the candidates. He pointed out that each faculty member’s work had been reviewed each year, that the faculty worked closely with each other largely in team efforts and that they sat in on each other’s classes to regularly assess methodology. Comment and input had been invited from all fellow teachers, and there was evaluation by outsiders as well.
Nevertheless, faced with remand, the college faculty members of the joint review committee, despite their prior approval of all candidates, evidently felt they had to reconsider the applicable criteria. On the second time around the college faculty members of the committee voted against Professor La Rue with one abstention, and 2 to 1 for Professor Merton with one abstention. The law school faculty members each adhered to their original approval in all cases. The other four candidates again received unanimous recommendation. The results were reported to President Kenny and Chancellor Murphy.
Chancellor Murphy then wrote to both Professor La Rue, who had not mustered a majority vote, and to Professor Merton, who had one negative vote:
"I write to inform you that, after consideration the recom *538 mendations of the Dean of the City University School of Law at Queens College and the President of Queens College, and after careful review, I am not recommending your re-appointment with tenure to the Board of Trustees of the City University of New York. Your current appointment expires on August 31, 1988.
"I want you to know that I appreciate the service you have provided to the University.”
He did not merely "not recommend re-appointment” to the Board, but by refusing to transmit both affirmative and negative recommendations, precluded the Board from making the final decision.
The law school faculty reacted with outrage. Professor Farago, together with legal scholars from many other law schools, have been high in their praise of both rejected candidates, who are characterized as two of the finest law teachers that there are, and occupying a position at the very pinnacle of their profession. Several amicus briefs have been submitted on their behalf. Professor Farago has written that they were "the very core of our. faculty and the embodiment of the school’s mission and conceptualization.”
THE CHANCELLOR’S POWER TO BLOCK RECOMMENDED TENURE
It appears quite clear from the initial unanimous vote that the six candidates up for tenure met the appropriate law school criteria and standards. On the remand, despite the highly favorable evaluations of Professors Merton and La Rue given by the law school committees and its dean, it appears that the difference in outcome necessarily turned on the application by the college faculty members of the joint review committee of the general CUNY standards as to teaching effectiveness and scholarship rather than those particularly governing the law school. The chancellor did not pass along the two disputed candidacies to the Board of Trustees with either affirmative or negative recommendation, but took it upon himself to send notification that the teaching appointments of Merton and La Rue had been terminated. Plaintiffs maintain that the chancellor has acted arbitrarily in substituting his own judgment for that of the law school, and that in making his determination, he was not guided by the criteria of the law school set forth in the bylaws and the provisions of the governance plan.
The governance plan, which had received the imprimatur of *539 the Board of Trustees, had provided that it was the informed professional judgment of the law school committees which would be the basis for deciding whether a candidate for tenure has done the necessary scholarly work. The function of the review committee which split its vote after the remand was limited to consideration of whether an appropriately searching inquiry into the candidate’s qualifications had been made, an adequate dossier built up and evaluated, and the law school’s tenure standards appropriately applied. (Bylaws § II-5.)
If there was a question presented as to the appropriate standards to be applied — the tenure standards of the law school or the standards of the City University generally — both of which had been approved by the Board of Trustees, at the least, the question should have been presented to the Board. It should be noted that section 9.12 of the university bylaws gives primacy to the governance plan of the particular school involved whenever there are inconsistencies. The chancellor was confronted with a decision not as to the individual qualifications of the candidate, but as to what were the appropriate and applicable guidelines. It would appear that kind of determination, calling for a choice of guidelines and criteria as between two standards approved by the Board of Trustees, should have been referred to the Board of Trustees for its decision, together with whatever personal views or recommendations the chancellor cared to make.
The question squarely posed to this court is whether the chancellor, as the penultimate link in the chain, has the power not only to pass along a favorable recommendation for an appointment with tenure to the Board of Trustees, but whether he has the power to single-handedly halt the appointment process himself by choosing not to forward favorable recommendations. Plaintiffs insist that his powers are restricted to making a determination as to whether there was an adequate review of the qualifications of the candidates, the substantive review of individual competence having already been passed upon by the duly constituted faculty committees and the dean. Defendant insists that while only the Board of Trustees has the power to grant tenure, the chancellor has the unilateral power to deny it.
Both sides rely heavily on the decision of the Appellate Division, First Department, in Matter of Rodriguez-Abad v Kibee (71 AD2d 588). In that case, two faculty members of the City University were denied promotion and reappointment. They had filed grievances. The grievances were sustained and *540 their qualifications were then submitted to a select faculty committee. The committee approved their candidacies, but the chancellor declined to follow the recommendations of the faculty committee. The appellate court held that the Board of Higher Education, predecessor to the University Board of Trustees, had the nondelegable duty to decide on appointments, promotions and tenure. The delegation of the power to decide to the chancellor was found to be improper. He was held to have the duty to transmit the faculty committee’s recommendations to the Board. Accordingly, it was concluded that the matter should have been sent back for review by the Board.
The refusal to pass a tenure decision on to the Board for its determination had previously been viewed with disapproval in Matter of Cohoes City School Dist. v Cohoes Teachers Assn. (40 NY2d 774, supra). The chancellor was not there involved, but the Court of Appeals held that once a Board was empowered under the Education Law to pass on tenure, the determination to terminate employment of a nontenured teacher could not be made by anyone else. In Pauk v Board of Trustees of City Univ. (654 F2d 856, cert denied 455 US 1000), a professor at Queens College was recommended for tenure by his department, but was disapproved for tenure by the college personnel and budget committee, and on his appeal therefrom the president of Queens College concurred in denying him tenure. His tenure application was never considered by the Board of Trustees. While the issue there involved was when the period of limitations began to run, the court had to pass on the question of whether there could be a negative tenure determination absent full consideration by the Board which would start the limitations period running. The court agreed that while the president of the college had no power to veto a recommendation for tenure on his own, but had to pass it on to the Board for review, the Board was not required to review a negative determination by a faculty review committee. Unlike the situation here, the candidate had not received favorable recommendations by the faculty charged with evaluating him.
Clearly, if a candidate is not recommended by the faculty review committee, there is no need to place that candidacy before the Board. However, the process of screening for tenure does not confer equal power on every entity involved in the seven-step review. Candidates are not required to run an endless gauntlet of identical review processes. There *541 would be little point or purpose in prescribing seven separate steps for tenure review, each of which is repetitive of the other. In the chain, each reviewing body is expected to perform a different function and each looks at the appointment from a different perspective. A tenure appointment can be stopped dead in its tracks by a group decision, but not by a single man or woman. Four of the entities involved are multiheaded committees who make a joint appraisal and evaluation in an atmosphere of interchange and collegiality. They are the tenure review committee, the budget and personnel committee, the joint review committee and ultimately the Board of Trustees itself. It is the Board which gets all the points of view and makes the ultimate decision. The individuals in the chain (the dean, the president and the chancellor) have a more limited duty. They serve as conduits for transmission. Their duties are not wholly ministerial, for they have the capacity and the power to determine whether all existing standards and procedures have been observed and adhered to. The president of the college is mandated to transmit the review committee’s recommendation with the report of the dean of the law school and her own recommendation for review by the chancellor, and he in turn is to go over them for his "review and” submission to the Board. (Bylaws § II-5.) Note that neither is empowered to reject tenure — they must transmit recommendations for tenure with their own views. Their review is not to be duplicative — it is to be a procedural rather than a qualitative review. They cannot insist, however, on applying inapplicable standards when, under appropriate standards, the candidate has been approved for tenure by three separate evaluating committees. It would be inappropriate to permit the college president or the chancellor to impose a unilateral veto upon a candidacy for the law school faculty. The ultimate decision must be made by the Board, and not by the chancellor or the president. They are to review and submit. There is no power to deny. That is not to say that they cannot append their own recommendations, affirmative or negative, to the report submitted on the tenure applicants. They had the power to recommend for or against, but they could by themselves neither appoint nor reject.
While the chancellor and the president of Queens College occupy lofty positions in the university hierarchy, they may not proceed in authoritarian fashion. The powers of the chancellor are set forth in section II-2 of the City University bylaws. He is a chief educator and administrative officer of the *542 university. It is specified in section II-2 (a) that he is "to report to the Board his/her recommendations for consideration for action on all educational issues affecting the university.” The powers enumerated for him do not "compromise or detract from the powers and duties of the Board.” (§ II-2 [j].) The powers of the college president, as set forth in section II-4 of the university bylaws, include "the duty to recommend to the Board for the appointment, promotion, and the granting of tenure only those persons who he/she is reasonably certain will contribute to the improvement of academic excellence at the college.” Her relationship to the law school, however, which has its own standards, may be somewhat different. Section II-4 (h) requires that she consult with the appropriate departmental and faculty committees on matters of appointment and promotion; take student evaluations into account in making recommendations thereon; present to the Board his/ her recommendations thereon; and notify the appropriate faculty committees of his/her recommendations to the Board. The duty to supply recommendations, positive or negative, is not tantamount to authority to deny or block appointments.
In this case, where there was not only approval, but strong and glowing recommendation of the qualifications of the candidates, with the reasons fully considered and set forth at length, it was an arbitrary act for the president and chancellor to reject tenure applications, refuse to transmit the recommendations to the Board of Trustees, and unilaterally terminate employment. The chancellor did not, in his ultimate rejection, state any reasons for disapproving the earlier recommendations as to the candidates’ qualifications. Since what was before him was a matter of precedent-setting policy as to the applicable standards and qualifications for tenure established by the Board itself, the matter should properly have been transmitted to the Board, with the chancellor’s reasons for recommending against tenure. This is especially so where there are contrary and diverse views as to the applicable criteria which govern and define what the CUNY Law School should be. Such a seminal policy matter is not appropriate for a vest-pocket veto, but should be aired before the Board.
The candidates and the law school have been deprived of the opportunity for guidance, and the Board , has been deprived of the power, vested by law solely with it, to make the ultimate determination as to tenure, and tenure standards. This is not a situation involving questions of academic misconduct or incompetence. Rather, it involves fundamental policy *543 questions of a type rarely presented to the Board on tenure applications.
I therefore hold that in light of the foregoing, the defendants’ cross motion to dismiss the petition is granted only insofar as dismissing the complaint as to all plaintiffs except La Rue and Merton, and the motion for interlocutory relief is granted to the extent of directing the chancellor to transmit the tenure applications of Professor La Rue and Professor Merton to the Board of Trustees together with all affirmative and negative recommendations and the supporting material therefor, along with the opinion of this court. In the interim, plaintiffs La Rue and Merton, who will suffer irreparable injury if left in limbo, are to be reappointed for an additional one-year period but without tenure, during which period the Board of Trustees can make its evaluation and, if necessary, remand the matter to the joint review committee with appropriate instruction as to the standards to be followed in passing on CUNY Law School tenure applications. (See, Matter of Broadalbin Teachers Assn. [Broadalbin Cent. School Dist.], 97 AD2d 672; Matter of United Liverpool Faculty Assn. v Board of Educ., 52 NY2d 1038, 1040.) It is not necessary at this time to pass on the claim of plaintiffs of civil rights violations.